# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CAROL A. WOOLMAN, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LINDA S. MCMAHON, )<br>Commissioner of Social Security )<br>Administration,[1] )<br>)<br>Defendant. ) | No. 06-CV-42-SAJ |

### **OPINION AND ORDER**[2]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[3] Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to perform a proper evaluation at Step Three of the sequential evaluation process; (2) the ALJ failed to properly evaluate the treating physician's opinion; and (3) the ALJ failed to properly evaluate Plaintiff's credibility. For the reasons discussed below, the Court reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

---

[1] Effective January 22, 2007, pursuant to Fed. R. Civ. P. 25(d)(1), Linda S. McMahon, Acting Commissioner of Social Security, is substituted for Jo Anne B. Barnhart as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[3] Administrative Law Judge Gene M. Kelly (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated June 24, 2005. [R. at 20 - 28]. Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on November 21, 2005. [R. at 9].

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born May 9, 1959. [R. at 58]. Plaintiff applied for social security benefits by application dated June 17, 2003. [R. at 60].

On her Disability Report form, Plaintiff indicated that she suffered from two ruptured discs that led to a double lumbar fusion. Plaintiff wrote that she was unable to sit, stand, lift, or drive distances. [R. at 78, 87]. Plaintiff completed two years of college, but did not obtain a degree. [R. at 93, 323].

Plaintiff described an average day in her disability supplemental interview outline. Plaintiff noted that she showered and got dressed; that she got her son ready for school; that she did the exercises prescribed by her doctor and walked three or four times each week. [R. at 96]. Plaintiff also did light housework, ran errands, and rested. [R. at 96].

Plaintiff noted that she usually slept for five to six hours each night, but that her sleep was not restful and she previously slept eight to ten hours each night. [R. at 96]. Plaintiff noted that she prepared breakfast, lunch, and dinner, and that preparation time was about two to three hours. [R. at 97]. Plaintiff does light housework, including dusting, and cleaning counters. [R. at 98]. Plaintiff shops for groceries and clothes three or four times each week. Plaintiff noted that she requires assistance in loading and unloading the groceries. [R. at 98]. Plaintiff reads about one hour two to three times each week. Plaintiff watches the history channel and old movies about two to three hours each night while resting her back in bed. [R. at 99]. Plaintiff noted that she was able to water her plants, but that she was unable to do much gardening. [R. at 99]. Plaintiff socializes with friends two or three times each week. Plaintiff's husband usually drives. [R. at 100]. Plaintiff wrote that she can no longer volunteer for activities that require meetings which last longer

than an hour because it was too hard on her back. [R. at 100]. Plaintiff also noted that she previously socialized a lot, but that due to her back pain she had to make short trips and stay close to home. [R. at 100].

Plaintiff completed a pain questionnaire on July 6, 2003. [R. at 105]. Plaintiff noted that after making a light breakfast she would rest for approximately thirty minutes. Plaintiff made lunch and walked or did her physical therapy exercises. Plaintiff rested her back before making dinner, and spent the reminder of the evening reading or watching movies with her son. [R. at 105]. Plaintiff noted she could no longer garden because of the bending requirement. Plaintiff wrote that she could not do heavy housework because she is unable to lift heavy items. [R. at 105]. Plaintiff is unable to drive long distances or lift heavy sacks. [R. at 105].

Plaintiff wrote that she experienced sharp pain which was generally a burning and aching pain in her lower back and left leg. [R. at 105]. Plaintiff experiences less pain in the morning, and her pain increases during the day depending upon her daily activities. [R. at 105]. Plaintiff's pain increases if she sits, rides in a car, or stands too long. [R. at 105]. Plaintiff noted that she took Naproxen and Darvocet for her pain. [R. at 106]. A medications list dated October 28, 2004 noted that Plaintiff was taking Extra Strength Tylenol and Tylenol PM for pain. [R. at 131].

Plaintiff was admitted for an MRI Lumbar x-ray on March 23, 1995. [R. at 138]. Alignment was revealed as normal with a left-sided disc herniation at L5-S1 level with disc material upon the left S1 nerve root. The remaining discs appeared normal without focal protrusion or herniation and no evidence of spinal stenosis. [R. at 139].

Plaintiff was treated for gastric pain by Thomas D. Shriller, M.D., on September 9, 1998. He noted that Plaintiff would be placed on Prilosec. [R. at 132]. On progress reports dated November 3, 1998, Plaintiff's doctor noted that he believed Plaintiff had endometriosis. [R. at 133]. Testing on Plaintiff's stomach revealed that all materials were benign. [R. at 134-35].

Plaintiff reported upper quadrant pain on a daily basis in December 1998. [R. at 177]. The doctor noted that he would have chest x-rays and an abdominal ultrasound to investigate the cause of the pain. [R. at 177].

Plaintiff complained of intermittent back pain and twinges in 1999. [R. at 214]. Plaintiff had a diagnostic laparoscopy to diagnose her upper quadrant pain on March 30, 1999. [R. at 217].

An echocardiogram report dated February 16, 2000 was interpreted as revealing a normal aorta. [R. at 140]. No pericardial abnormality was observed. [R. at 140].

Plaintiff had a lumbar epidural steroid injection on May 25, 2000, June 8, 2000, and July 26, 2000. [R. at 206, 207, 209]. Lumbar x-rays in May 2000 indicated varying degrees of disk degeneration from L4 to S1 with no definite herniated nucleus pulposus material observed. [R. at 212].

Plaintiff had an initial evaluation by Gerald R. Hale, D.O., on January 26, 2001. [R. at 143]. Plaintiff was 41 years old at the time and had a decompression approximately five years previously at the L5-S1 level. [R. at 143]. Plaintiff had done well after the surgery but beginning in the prior Spring, Plaintiff began to experience recurring lower back and left hip pain in addition to pain down her left leg and below her knees. Plaintiff did not respond to steroid injections. [R. at 143]. A lumbar MRI showed some borderline changes with

spinal stenosis at L4-L5 and varying degrees of disc degeneration at L4-L5 and L5-S1. Plaintiff had been taking Celebrex and Vicodin for pain control. Plaintiff did not respond to physical therapy or epidural injections. Plaintiff had a normal range of motion of her shoulders, elbows, wrists, and digits. Plaintiff's lumbar spine exam revealed a prior microdiskectomy scar in the lumbar region. Plaintiff was tender over the lumbosacral junction. Straight leg raising produced some lower back pain and hip pain. [R. at 144]. Injections were made at the L3-L4, L4-L5, and L5-S1 points. Both the L4-L5 and L5-S1 demonstrated severe concordant pain responses and a small tear was noted at the L4-L5 with the defect at the L5-S1 more broad-based. [R. at 144].

Plaintiff was examined by a neurosurgeon on April 1, 2001. [R. at 191]. He noted that Plaintiff previously injured herself while working and required surgery for her back pain. He noted that Plaintiff's pain improved, but that in January 2000, Plaintiff developed increasing pain which was not relieved by physical therapy or epidural steroid injections. Plaintiff lost weight. Plaintiff had a lumbar diskography on January 26, 2001, but coughing and sneezing increased her pain, and sitting or walking increased her pain. [R. at 191]. The neurosurgeon recommended surgery. Plaintiff had a lumbar total decompressive laminectomy, a bilateral diskectomy, a lumbar total decompressive laminectomy, and a bilateral diskectomy on April 6, 2001. [R. at 188]. On May 31, 2001, Plaintiff reportedly was still feeling some pain, but the pain was improving over time. [R. at 245].

A lumbar spine MRI dated September 13, 2001, was interpreted as indicating normal alignment. [R. at 193]. No evidence of focal disk herniating or spinal stenosis was detected. [R. at 193]. On October 25, 2001, Plaintiff's doctor noted that the MRI of her lumbar spine was "quite normal, given her postoperative state." [R. at 242].

By July 11, 2002, Plaintiff was doing well and was down to one Darvocet per day. [R. at 239]. Notations on Plaintiff's medical chart on August 6, 2002, indicated an allergy to Demerol. [R. at 149].

Plaintiff had a colonoscopy in August 2002. The doctor noted that Plaintiff had a few small polyps removed, and that because of Plaintiff's prior history of endometriosis, Plaintiff required greater than the normal amount of pain medication to complete the procedure. [R. at 171].

Plaintiff discussed removal of the hardware on January 30, 2003. Plaintiff reported tenderness over the hardware. [R. at 238]. On February 11, 2003, Plaintiff had a hardware injection and an injection of bone donor site due to Plaintiff's complaints of pain at her donor site and pain traveling down her left leg. [R. at 186]. On March 7, 2003, Plaintiff had surgery to remove instrumentation at L4 to S1, exploration of fusion L4 to S1, and excision of a subcutaneous nodule. [R. at 182].

Plaintiff was uncomfortable during an office visit on May 14, 2003. [R. at 230]. On May 8, 2003, Plaintiff underwent a surgical procedure for injection of the bone graft donor site at the left iliac crust. [R. at 181].

A lumbar spine MRI was done on Plaintiff on May 17, 2003, after a "recent removal of hardware." [R. at 180]. No focal disk herniations were observed. [R. at 180]. No central or neuroforaminal stenosis was discerned. [R. at 180].

On June 4, 2003, Plaintiff's doctor noted that Plaintiff's new MRI did not demonstrate any new abnormality of the L3-4 disk or any above it. The areas of decompressions and fusions appeared widely patient throughout. "I do not have a good explanation for her persistent symptoms." [R. at 228].

Plaintiff was examined by Moses A. Owoso, M.D., on August 27, 2003. [R. at 261]. Plaintiff complained of low back pain. [R. at 261]. Plaintiff had a discectomy in 1995, and six years after that had a fusion of the lower lumbar spine. Plaintiff's pain continued and she had removal of the hardware in March 2003. Plaintiff's back pain resumed. An MRI did not show focal disc herniations or central or neuroforaminal stenosis. Plaintiff stated she still had some low back pain. [R. at 261]. Plaintiff reported that she quit working to stay home with her son and to rest her back. [R. at 261]. Plaintiff was taking Darvocet. Plaintiff reported smoking 1/4 of a pack of cigarettes and drinking occasionally. Plaintiff was 5'8" tall and weighed 124 pounds. [R. at 262]. Examination of Plaintiff's major joints and hands were normal. Strength in all muscle groups was 5/5 bilaterally. [R. at 263]. Plaintiff's alignment of her spine was normal. Plaintiff's gait was balanced and stable and Plaintiff got on and off of the exam table independently. [R. at 263]. The doctor completed a range-of-motion chart for Plaintiff, finding most ranges-of-motion full. [R. at 264].

A Residual Physical Functional Capacity Assessment form was completed by Thurma Fiegel, M.D., on September 5, 2003. [R. at 274]. Plaintiff was noted as being able to lift or carry 20 pounds, occasionally and ten pounds frequently. [R. at 263]. Plaintiff could stand or walk about six hours in an eight hour day, and sit about six hours in an eight hour day. [R. at 263]. The assessment was affirmed as written by Paul Woodcock, M.D., on October 30, 2003. [R. at 274].

Plaintiff was seen by James A. Rodgers, M.D., on referral from Dr. Capehart, on August 5, 2003. [R. at 278]. Dr. Rodgers noted that after Plaintiff's surgery to remove her instrumentation in March 2003, Plaintiff did fine for four to six weeks. Plaintiff's pain had increased since that time and Plaintiff currently took Darvocet and Naprosyn. Straight leg

raising on the right side caused no significant pain. [R. at 279]. Plaintiff's left ankle jerk was diminished compared to her right. Plaintiff had no definite hypesthesia to pinprick testing. Plaintiff could heel and toe walk. [R. at 279]. The doctor's impression was that Plaintiff had post laminectomy syndrome and left leg radiculitis subsequent to removal of instrumentation. [R. at 279]. The doctor recommended Neurontin twice a day. [R. at 279].

On September 15, 2003, Mark Capehart, M.D., noted that Plaintiff had not received much improvement from the Neurontin. Plaintiff reported burning pain in her left buttock which increased as she sat. Plaintiff reported that straight leg raising caused pain. No tenderness was noted at the L5-S1 nerve pattern. The doctor recommended that Plaintiff have a selective nerve block at L5-S1 and possibly an injection around her iliac crest donor site. [R. at 277].

Plaintiff's attorney submitted a form which Plaintiff's attorney provided to a doctor for completion. The doctor indicated that Plaintiff could sit one hour during an eight hour day, stand two hours during an eight hour day, and walk for two hours in an eight hour day. [R. at 308]. The doctor wrote that Plaintiff had a history of chronic low back pain, chronic leg pain, and redeveloped leg pain. [R. at 309]. Plaintiff exhibited restrictions with bending and straight leg testing. [R. at 309]. The doctor wrote that "presently she would be considered totally disabled." [R. at 310]. Most of the range-of-joint evaluations were not completed, but Plaintiff's back extension was noted as extension 5 degrees and flexion 40 degrees. Plaintiff's hip flexion was noted as 60 degrees. [R. at 311].

Plaintiff testified at a hearing before the ALJ on October 28, 2004. [R. at 317]. Plaintiff was 45 years old at the time of the hearing before the ALJ. [R. at 322]. Plaintiff testified that she was 5'8" tall and weighed about 133 pounds. [R. at 321].

According to Plaintiff, she has arthritis in her hands and it hurts to grip pencils for any length of time. [R. at 324].

Plaintiff testified that she worked for a communications company for seven years, and left after her laminectomy in 1995. [R. at 325]. Plaintiff stated that she left because her back was becoming worse and she wanted to spend time with her son before he grew up. [R. at 325]. Plaintiff noted that she has not attempted to return to video production (her prior job) because she can no longer lift, bend, or stoop. [R. at 326]. Plaintiff also noted that she tried to do some office work for her husband for about two to four hours each day, but that work became too difficult for her to do because of her inability to sit. [R. at 326].

Plaintiff testified that she is unable to work due to pain from lifting, stooping, or sitting. The pain, according to Plaintiff, travels from her lower back down her legs. Plaintiff also stated that she has arthritis and experiences stiffness in her joints. [R. at unnumbered page between page 328 and page 329]. Sitting exacerbates her pain, and standing also makes the pain worse. [R. at 320]. Plaintiff noted that picking up items with her fingers and thumb would hurt. [R. at 332].

Plaintiff observed that she could work on the computer or do beadwork for approximately 20 to 30 minutes before she could no longer concentrate on what she was doing and that she would hurt. [R. at 332]. Plaintiff noted that if she rested for 30 minutes, she could then continue to work for another 15 to 20 minutes. [R. at 333].

Plaintiff testified that her lower back causes severe chronic pain that radiates to her legs. Originally the pain started with her left leg and went through her left calf and heel.

In the months prior to the hearing, Plaintiff's right leg had begun hurting with the pain traveling through her calf and occasionally to her heel. [R. at 334].

Plaintiff noted that she had a fusion in her back in 1999, and a double fusion in 2001, but that the back surgeries had not extinguished her pain. [R. at 334]. Plaintiff had hardware placed in her back to support the bone graft, but believes that she either had nerve damage or something did not heal properly because she still experienced pain. [R. at 335]. Plaintiff had the hardware removed, but still has pain. [R. at 335].

Plaintiff believes that she drives approximately 20 miles each week. [R. at 336]. Plaintiff is no longer able to easily walk up and down stairs, and Plaintiff moved from a two-story house to a one story house due to this difficulty. [R. at 335].

Plaintiff uses heating pads and cold packs to help alleviate pain. [R. at 341]. Plaintiff does some exercises that were prescribed by her doctor. [R. at 341]. Plaintiff uses a lightweight vacuum cleaner to sweep the floors. [R. at 341]. Plaintiff does some laundry. [R. at 342]. Plaintiff watches television while lying down. [R. at 342]. Plaintiff reads some. [R. at 343].

Plaintiff also noted that she has lost quite a bit of weight. Plaintiff lost weight when she had surgery and has had difficulty gaining weight because she did not feel like eating. [R. at 344]. Plaintiff believes that on an average night she will sleep approximately five hours. Plaintiff sometimes lays down during the day to rest. [R. at 344]. Plaintiff can generally sit approximately 15 to 30 minutes before needing to stand. [R. at 345]. Plaintiff can walk for approximately 30 minutes. [R. at 345]. Plaintiff noted that her doctor suggested that she not lift any weight in excess of 20 pounds. [R. at 346]. Plaintiff can drive for approximately 30 to 40 minutes before she must stop to take a break and stand

or lay down. [R. at 348]. Usually, during the day, Plaintiff lays down for approximately 30 minutes in the morning and 30 minutes in the evening. [R. at 348].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[4]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[5/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The

---

[5/]  Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ concluded that Plaintiff did not meet a Listing at Step Three of the sequential evaluation. The ALJ found Plaintiff's credibility lacking. The ALJ also noted that although Plaintiff complained of hand pain and arthritis when she testified at the hearing, nothing in the record indicates that Plaintiff was treated for such a problem. [R. at 24]. The ALJ concluded that Plaintiff could perform a wide range of sedentary work. The ALJ determined Plaintiff's RFC permitted Plaintiff to lift and carry 20 pounds, stand or walk for six hours in an eight hour day at 30 minute intervals, and sit for six hours in an eight hour day for thirty minute intervals. [R. at 25].

### IV.  REVIEW

**Discussion of the Listings**

At step three of the sequential evaluation process, a claimant's impairment is compared to the Listings (20 C.F.R. Pt. 404, Subpt. P, App. 1). If the impairment is equal or medically equivalent to an impairment in the Listings, the claimant is presumed disabled. A plaintiff has the burden of proving that a Listing has been equaled or met. *Yuckert*, 482 U.S. at 140-42; *Williams*, 844 F.2d at 750-51. In his decision, the ALJ is "required to discuss the evidence and explain why he found that [the claimant] was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996).

Plaintiff asserts that the ALJ erred by not discussing the Listings and detailing the four domains of functioning for Listing 12.04 for affective disorders.

In *Clifton*, the ALJ did not discuss the evidence or his reasons for determining that the claimant was not disabled at step three, or even identify the relevant listing. The ALJ merely stated a summary conclusion that the claimant's impairments did not meet or equal any listed impairment. The ALJ in this case did not discuss the medical evidence in connection with his Step Three conclusion. The Tenth Circuit Court of Appeals held that such a bare conclusion was beyond any meaningful judicial review. *Clifton*, 79 F.3d at 1009.

In particular, the Tenth Circuit held as follows:

> Under the Social Security Act,
>
>> [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.
>
> 42 U.S.C. 405(b)(1). . . .
>
> This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. 42 U.S.C. 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). . . . Rather, we review the [Commissioner's] decision only to determine whether her factual findings are supported by substantial evidence and whether she applied the correct legal standards. . .
>
> In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant

> evidence adequately supports the ALJ's conclusion that [the claimant's] impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion. The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. . . . Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. . . . Therefore, the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three.

*Clifton*, 79 F.3d at 1009-10 (internal case citations omitted).

In this case, the ALJ noted that Plaintiff did not meet a Listing. The ALJ referenced Listings 1.04, 1.02 and 12.04. The ALJ provides no additional discussion of why Plaintiff did not meet a Listing.

Plaintiff asserts that the ALJ erred in not discussing the ability to function in four domains in relation to 12.04 of the Listings. In the decision, the ALJ mentions that although Plaintiff alleges depression, lack of concentration and irritability difficulties, Plaintiff was never treated by a mental health specialist and Plaintiff's prescriptions did not indicate the existence of a mental impairment. The ALJ's decision does not further elaborate upon Plaintiff's asserted mental impairment. The ALJ does not discuss the four domains or ability to functions.

The ALJ specifically mentions Plaintiff's alleged depression at Step Two, finding that the depression is "severe." Step Two is a *de minimus* finding, and is met when a claimant has "any impairment or combination of impairments which significantly limits . . . physical or mental ability to do basic work activities. . . . " 20 C.F.R. 21 404.1520(c). Therefore, by concluding that Plaintiff had some form of mental impairment, the ALJ was obligated to

address the degree to which the Plaintiff's mental impairment impacted her ability to perform work-related functions. The ALJ's discussion briefly addresses the Listings. However, even if the Court could conclude that the ALJ in some way adequately discussed the applicability of the Listings, the ALJ never addresses the four domains of functioning or complies with the applicable regulations. *See* 20 C.F.R. § 1520a(c)(3) ("We have identified four broad functional areas in which we will rate the degree of your functional limitation. . . ."); 20 C.F.R. § 1520a(e) ("At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels . . . , we will document application of the technique in the decision.").

The ALJ, in his discussion of Plaintiff's alleged depression suggests that Plaintiff does not have a medically diagnosed impairment. [R. at 24 ("The occasional and non-continuing prescription of medication does not show the existence of a mental impairment, particularly, when there is no objective medical evidence showing a meeting of the established diagnostic criteria necessary to support a diagnosis of any mental impairment."). However, these conclusions of the ALJ are difficult to reconcile with the ALJ's Step Two findings that the alleged depression was "severe."

The Court concludes that the decision of the ALJ contains inadequate reasoning to support the ALJ's conclusion regarding Plaintiff's alleged depression.

Defendant refers the Court to *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988), as support for Defendant's position that the mere naming of a mental disorder without more does not establish that mental limitations would preclude the ability to perform work.

However, in *Bernal*, the ALJ clearly considered the impact of the alleged mental impairment on the claimant's work. *Bernal*, 851 F.2d at 301.

Defendant also urges the Court to apply the harmless error analysis in *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005), and uphold the ALJ's findings. In *Fischer-Ross*, the Tenth Circuit Court of Appeals noted that "[n]either *Clifton's* letter nor spirit require a remand for a more thorough discussion of the listings when confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." In this case, however, the Court is unable to rely upon the step four or five conclusions of the ALJ to affirm the findings at step three. In this case, the ALJ's discussion of Plaintiff's alleged depression is scant, appears contradictory to the ALJ's step two findings, and does not address the four domains of functioning as outlined in the regulations.

Dated this 26th day of January 2007.

Sam A. Joyner
United States Magistrate Judge